### John Looney and Frank H. Kelly v. The People of the State of Illinois.

1. CONSPIRACY—*Must be by at Least Two Persons.*—It is not necessary that the evidence should show that all the defendants charged in an indictment are guilty of conspiracy; it is sufficient if the guilt of at least two is shown.

2. CRIMINAL PROCEDURE—*The Right of Election.*—Where the counts of an indictment relate to the same transaction, and are of such a nature that the defendants might be guilty under each and all of them, they can not compel the prosecution to elect under which counts it will proceed.

3. SAME—*When the Right of Election Exists.*—The right to compel an election arises where an indictment joins charges actually distinct from each other and which do not form parts of one and the same transaction.

4. SAME—*General Verdict.*—Under an indictment containing different counts, some good and some bad, a general verdict of guilty will be referred to the good counts.

5. ACCOMPLICES—*Can Not Prosecute for the People.*—An accomplice in a criminal case has no right to prosecute the State's case. He has a right to put in evidence to exonerate himself, or lessen the degree of his

Looney v. The People.

guilt, and to confess his guilt, but he has no right to introduce new and original evidence of the guilt of his co-defendants of a character not competent, except as offered by the State.

6. CONVICTION—*May be Shown to Affect the Credibility of a Witness.* —A conviction of a witness, of an infamous crime may be shown for the purpose of discrediting his evidence.

7. WITNESS—*Should Assert His Own Rights.*—A witness may decline to answer questions touching his former conviction of an infamous offense. Under the special circumstances of the case the court should not have asserted his rights for him.

8. TRIAL JUDGES—*Improper Conduct at Trials.*—The law concedes to every trial judge a wide latitude in protecting those who are defenseless from improper proof, or from assaults by opposing counsel, and also in putting questions which will bring out the truth upon points not rendered sufficiently clear by the examination of counsel; but great care should be taken by the judge to exercise this power only when necessary, and then in such a way as not to indicate any bias for or against either party, and so as not to create any apprehension in the mind of either party or of counsel that the court is taking sides before the jury.

9. STATE—*Its Duty Toward Criminal Defendants.*—It is the duty of the State to treat the defendants in a criminal case fairly.

10. EVIDENCE—*Acts of an Indicted Defendant.*—On the trial of several persons for conspiracy to defraud a city in constructing a drain the evidence of the acts of a defendant who inspected the work as the representative of the city, though indicted, is competent. The court can not assume before verdict that he was in fact either a conspirator or incompetent.

11. SAME—*Of the Quality of Materials.*—In a trial on a charge of conspiracy to defraud a city in constructing a public walk, evidence showing that the quality of the materials used in the walk was equal to that called for by the contract is competent on the question of the intent to defraud.

12. IMPEACHMENT—*Where a Witness Has Made Different Statements Before the Grand Jury.*—Where an effort is made to impeach a witness by proving that he has made statements before the grand jury different from his testimony at the trial, the procedure is the same as that to be followed when it is sought to contradict him by his statements made anywhere else.

13. DISCRETION—*Abuse of, in Re-opening a Case.*—Where a witness testifies to a criminating transaction and fixes the date, and the defendant establishes an *alibi*, it is not proper to allow such witness, after the arguments are begun, to fix a different date to such transaction without some showing to justify the introduction of such testimony.

**Indictment for a Conspiracy.**—Trial in the Circuit Court of Rock Island County; verdict and judgment of guilty; error by defendants. Heard in this court at the December term, 1898. Reversed and remanded. Opinion filed April 11, 1899.

J. T. KENWORTHY, attorney for plaintiffs in error.

CHAS. J. SEARLE, State's attorney in and for Rock Island county, for the People; SWEENEY & WALKER, of counsel.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

Matthias Schnell, John Mulhern, William Nevins, John Looney, Frank H. Kelly, Thomas Cox, Henry Lahiff, Daniel Drost, Henry G. Paddock, Martin Frick and Spencer Mattison, were indicted in the court below for a conspiracy to defraud the city of Rock Island in the construction of the Twenty-fourth street storm drain. On a motion to quash, it was claimed that the indictment was defective in its manner of charging Mattison. The State's attorney entered a *nolle prosequi* as to Paddock, Frick and Mattison. It is argued this was improper, being an attempt to amend the indictment. This objection seems to rest upon the claim that a conspiracy must be proved between all the persons charged or it is not the conspiracy alleged. We understand the law to be that it is not necessary the evidence shall show all the defendants guilty of conspiracy if the guilt of at least two is proven. 2 McLain's Criminal Law, Sec. 981; Moore's Criminal Law, Sec. 663; 3 Greenleaf on Evidence, Sec. 97.

The motion to quash was properly overruled. Defendants pleaded not guilty. Looney and Kelly moved the court to compel the State to elect under which counts it would proceed, claiming the first and second counts were under section 46 of the criminal code, the third at common law and the remaining six under section 46a, and that these were different offenses and could not be joined in one indictment. We think this classification not entirely correct, but the nine counts relate to the same transaction and are of such a nature defendants might be guilty under each and all. The right to compel an election arises where an indictment joins charges actually distinct from each other and which do not form parts of one and the same transaction. (Ochs v. The People, 124 Ill. 399; Herman v. The

People, 131 Ill. 594; George v. The People, 167 Ill. 447.) The motion to compel the people to elect was properly denied. Most of the counts are certainly good. The jury rendered a general verdict of guilty, and it will be referred to the good counts. (Hiner v. The People, 34 Ill. 297; Ochs v. The People, *supra*.) The jury fined Schnell, Nevins and Looney each $2,000; Kelly $1,500; Drost $100; Cox and Lahiff each $50, and Mulhern $1. After motions for a new trial and in arrest were denied, judgment was entered against Looney and Kelly, and they prosecute this writ of error therefrom.

Under a proper ordinance the city of Rock Island advertised for bids to construct said storm drain. Mulhern bid $12,169.45, was awarded the job, executed a written contract, and gave bond for its performance. Schnell was a surety. After the work had progressed a time Mulhern was financially unable to go on. An arrangement was made between Mulhern and his sureties and the city by which Mulhern assigned his contract to Schnell, and the latter built the drain. Nevins was superintendent for both contractors. Paddock was the engineer who made the survey, drew the plans and specifications and inspected a small part of the work. He had another engagement in Moline, and the city made Frick inspector of this work. Looney and Kelly were practicing lawyers and in partnership. They were attorneys for Schnell by the year. They also acted as attorneys for Mulhern. They drew his bid and bond and the assignment to Schnell. They furnished a certified check for $500 to be deposited with Mulhern's bid. They twice paid the pay roll with Schnell's funds. They acted and advised generally for said contractors. They were several times upon the work. When any matter arose of difficulty or controversy concerning the work their office was the headquarters where the parties met. A committee of the council reported the storm drain had not been completed according to contract, but was defective. Looney and Kelly, for Schnell, applied to the council for a hearing of the matter, obtained it, appeared and examined witnesses

as to the character of the job, the qualities of different cements, etc., and made an argument to the council urging it to accept the work.

· The storm drain was built of brick.   The contract required hard burned brick.   It is claimed inferior and soft brick were used.   The contract required the use of a cement mortar made of one part Portland cement and two parts sand. It is claimed that in a large part of the work, especially that remote from public observation, Milwaukee cement was used, sometimes wholly and sometimes mixed with Portland, and that Milwaukee cement was very inferior to Portland and much cheaper.   The contract required the use of concrete for a back filling around and under the storm drain.   It is claimed common dirt, sand and loose stones were used instead of concrete.

The prosecution claimed Mulhern had neither the means, knowledge or ability to take such a contract; that he was but a figure head, and that from the time his bid was prepared there was a conspiracy between the defendants to build an inferior drain of cheap material and get the contract price; and that Looney and Kelly were financially, but secretly, interested in the contract.   The proof shows the drain was not built according to contract; that Schnell secretly substituted Milwaukee for Portland cement, and used other materials different from the contract.   It may be assumed for this case that it was proved that Milwaukee cement was inferior to Portland cement, and much cheaper; that other materials used were inferior to those required; that the city would have been defrauded if it had accepted and paid for the work; and that Schnell and Nevins were guilty of conspiring to defraud the city as charged.

But Looney and Kelly had no apparent personal connection with the actual construction of the drain.   They had no practical or expert knowledge of the relative values of different cements.   Very many of their acts are capable of the apparently reasonable explanation that they were just what they openly appeared to be—attorneys for the men who bid for and got the contract and did the work.   Looney

Looney v. The People.

and Kelly had a right to be attorneys for these men, to draw the bid and the bond, and advise them in legal matters, and to apply to the council for them, examine witnesses there and make an argument. It was not improper or unusual that their office should be headquarters for their clients, where parties could meet and discuss difficulties and make arrangements as exigencies arose requiring conference. These acts do not lead to any necessary conclusion of participation in a conspiracy to defraud, even if their clients had formed and were executing a guilty purpose of that kind. They were comparatively young practitioners and likely to give more time and attention to the business of their clients than older lawyers would have the inclination or time to do. True, their position as attorneys for the contractors may have been a mere subterfuge, and they may have been engaged in a scheme to rob the city, and share the spoils. But the natural explanation of much of their conduct is consistent with their innocence of crime, and the State had the burden of overcoming that explanation and clearly demonstrating that they were conspirators and not merely attorneys.

We are of opinion the conviction of Looney and Kelly rests chiefly upon the testimony of Lahiff, Cox and Kennedy. They testified to acts and conversations of Looney and Kelly which strongly tended to show the latter had a pecuniary interest in the contract, had a guilty knowledge of the deception being practiced upon the city, and took part in the effort to perpetrate the fraud. There was very little proof of that kind against them outside the testimony of those three witnesses. Looney and Kelly either denied or sought to explain all the testimony tending to show their guilt. They claim that as to said three witnesses they did not have a fair trial.

Lahiff and Cox were witnesses before the grand jury, so that the State's attorney was advised of what they knew. They were included in this indictment and pleaded not guilty, but no counsel appeared for them. They had previously been working upon a dwelling house Looney was

erecting, but had a difficulty with him about their pay. Lahiff testified that when this difficulty arose he and Cox then decided to be witnesses in this case. Lahiff sued Looney, and that suit was pending when this suit was tried, and Lahiff's attorneys in that case against Looney assisted the State's attorney in the prosecution of this case. The proof showed that during the trial of this case Lahiff and Cox were frequently at the office of said attorneys. The State did not put Lahiff and Cox upon the stand, but closed the case for the people without their very damaging evidence against Looney and Kelly. The case submitted by the State in chief against Looney and Kelly was certainly a weak one. After Looney and Kelly had put in substantially all their evidence, and had themselves testified fully in answer to the case the State had presented against them, Lahiff took the stand and handed the State's attorney a written statement of what he knew about the case. The State's attorney then announced in the presence of the jury that no inducements had been held out to Lahiff and Cox, nor any promise of clemency by the State, and that if they took the stand they did so voluntarily and without any understanding whatever with the State, and that for weeks if not months said defendants had desired to talk with him, but he had refused. No exception was saved to this statement, but it is a part of the history of the case. It shows the State's attorney knew they were about to give evidence favorable to the State, for a defendant usually takes the stand to establish his innocence, and unless the State's attorney had known otherwise in this case he would not have said what he did. The remarks of the State's attorney were improper and contained matter which could lawfully be shown the jury only by testimony from the witness stand, under oath and subject to cross-examination. Its natural effect would be to prepare the minds of the jury for a favorable reception of the testimony of Lahiff and Cox.

We may say generally of the testimony of Lahiff and Cox that it does not seem to have been addressed to their own defense, or to denying any testimony which had been

introduced against them. They sought to show the guilt of Looney and Kelly, and their own intimate connection therewith at the later stages of the alleged conspiracy. Their testimony occasionally touched other defendants, but was specially aimed at Looney and Kelly. The State's attorney, in cross-examining them, did not seek to discredit their evidence or test its truth, but to fortify it and make it appear to the jury stronger and more credible. In the character of cross-examiner the State's attorney put leading questions to them, tending to support their story, which no one would have been permitted to put in a direct examination. In the matters hereinafter stated concerning Lahiff and Cox, and the witnesses to reputation, exceptions to the rulings of the court were duly preserved by defendants, save in two or three instances.

Lahiff and Cox were permitted, over objection, to detail conversations they severally had with persons not defendants, and to narrate what those persons said, and this as to conversations not proved by the State, and in matters calculated to harm Looney and Kelly. We think this was error. The State, while proving its case in chief, after introducing evidence tending to show a conspiracy, and that Lahiff and Cox were members of it, might have called those persons as witnesses against Lahiff and Cox and proved these conversations as tending to establish the criminality of Lahiff and Cox. But the State had closed its case and had no right at that late period in the trial to put in a new and much more serious case against Looney and Kelly. Lahiff and Cox had no right to prosecute the State's case. They had a right to put in evidence which would exonerate themselves or lessen the degree of their guilt, and had a right to confess their guilt. But we are of opinion they had no right to introduce new and original evidence of the guilt of their co-defendants of a character not competent unless offered by the State. Even if Lahiff and Cox had a right to prove Looney and Kelly asked them to see these parties and give them certain directions, they certainly ought not to have been permitted to testify what such per-

sons said that was harmful to Looney and Kelly. Lahiff testified that in a conversation between Kelly and Brown, the latter was made to believe that a certain paper he was asked to sign would throw no reflection upon Kennedy. The court overruled an objection by Looney and Kelly to this testimony. The witness should have been allowed to state only what was said. His inference and conclusion was improper, and the question whether Kelly did deceive Brown by this paper was important.

On cross-examination of Lahiff, the attorney for Looney and Kelly asked him whether, in 1872, he was convicted of larceny. The court interposed the objection that the question was incompetent and sustained the objection. Said attorney then asked Lahiff if he had not been convicted in 1884 of an assault with intent to rob; if he had not been in the penitentiary; what he was doing there, and how long he was there. After each of these questions the court told the witness he need not answer, and he did not. It is claimed it was the duty of the trial judge to protect Lahiff. We do not concur, under the circumstances of this case. The record shows the State's attorney announced that Lahiff and Cox had declined counsel. No one contradicted that statement, and we assume it was true. Lahiff's own lawyers were engaged in prosecuting. He was seeking to establish the guilt of Looney and Kelly. According to his own testimony he was doing this, not from any pangs of conscience, but because he had a difficulty with Looney about pay for work done by Cox and himself on Looney's house. The State had no right to object to these questions, for the State's attorney had denied that Lahiff was a witness for the State when that formal objection was made. The first of said questions related to a conviction for larceny, which is an infamous crime (Criminal Code, Div. 2, Sec. 7; Bartholomew v. The People, 104 Ill. 601), and such conviction may be proved to discredit a witness. (Criminal Code, Div. 13, Sec. 6.) The only tenable objection was that, in a criminal case, such proof is to be made by the record. The substance of the evidence sought to be

elicited was clearly competent and material, and the objection was purely technical. It was a proper question unless Lahiff or his counsel saw fit to object. By thus interposing to protect Lahiff when he did not ask help and had refused counsel, the court was screening him from the effect of a cross-examination by the defendants, at whom his testimony was aimed, and was therefore not merely helping Lahiff but also acting against and harming Looney and Kelly, who, though they had counsel, were powerless against the court. We think, under all the circumstances, the court should not have interposed this technical objection, but should have let the truth come out, unless Lahiff, who had refused counsel, was able to make the objection for himself.

Counsel for Looney and Kelly asked Lahiff if he did not tell John Blake that it was at the suggestion of his attorneys who were assisting the State's attorney that he did not employ counsel to defend him in this case, and that they had promised him if he would employ no counsel they would protect him in this trial. He denied that he so stated to Blake. The court then intervened for Lahiff, stated he was entitled to have his attention called to the time, place and language, and ordered the answer stricken out. The court was again acting, not only for Lahiff, but against Looney and Kelly. No objection had been made to the question and the witness had answered it, and the court should not have deprived Looney and Kelly of the benefit of that answer. Counsel for Looney and Kelly asked Lahiff if he had not signed a paper containing a statement at variance with his testimony in chief. The court objected, argued the point with counsel for Looney and Kelly, and sustained the objection. The trial judge struck out all of a long cross-examination of Lahiff by counsel for Looney and Kelly upon a subject germane to the direct examination. There were parts of this cross-examination that may have been subject to objection if a proper objection had been interposed when the questions were put, and perhaps were subject to be stricken out on motion, if Lahiff's

counsel had taken such action ; but other parts of said cross-
examination were entirely competent, and there was no
objection and no motion before the court.   After the court
had stricken out Lahiff's answer about Blake, as above
stated, the State's attorney on the second cross-examination
of Lahiff, was allowed by the court, over the objection of
counsel for Looney and Kelly, to obtain from Lahiff two
conversations he had with Blake, in which Blake urged
him to stick by the other defendants and to go and see
Kenworthy, the attorney for Looney and Kelly.   The State
had not called Blake or proved these conversations in chief,
and it had no right to them then.

Cox then took the stand in his own behalf.   The purpose
of Lahiff and Cox to testify, because angry at Looney about
pay for the building, had then been fully developed.   The
court addressed Cox in the presence of the jury, telling him,
among other things, that a failure to testify should not prej-
udice him in the eyes of the jury and the court, thus
preparing the jury to look with favor upon his voluntary
testimony against Looney and Kelly.   The court took about
the same part in the case while Cox was on the stand as
while Lahiff was testifying.   Cox was allowed, over the
objection of counsel for Looney and Kelly, to state things
that had been said to him by several people, not defendants,
prejudicial to Looney and Kelly.   Cox detailed attempts
he had made at the request of Looney to get Brown to
change a sworn statement made to the city authorities
about the cement and to swear to a different statement, the
inference being plainly suggested that the first statement
was true and that the second was false and to be purchased
and paid for by Kelly.   On cross-examination counsel for
Looney and Kelly asked him if he was willing to attempt
subornation of perjury for Looney, and if he was willing to
go into into a scheme with Looney to get Brown to testify
falsely.   After each of these questions the court interposed
and declared the question improper, and refused to permit
it to be answered.   We hold this was proper cross-exami-
nation.

Lahiff then called witnesses to prove his general reputa-
tion for honesty, etc. He was unable to frame proper
questions for the first witness. The court instructed him,
and finally conducted the examination in chief. After.
cross-examination, counsel for Looney and Kelly moved to
exclude the testimony. The court re-examined the witness.
in order to make the testimony competent, and then over-
ruled the motion. The court conducted the direct exami-
nation of the second and third witnesses upon reputation.
When the court began the direct examination of the fourth,
counsel for Looney and Kelly objected to the court putting
in this testimony, and the court overruled it on the ground
Lahiff was without counsel. Counsel for Looney and Kelly
insisted that if Lahiff needed counsel it was the duty of
the court to appoint counsel for him. This was overruled.
The court examined in chief the fifth witness upon reputa-
tion, over repeated objections. Objections were interposed
to the frame of the court's questions, and these objections
were overruled. It was, at least, a debatable question
whether some of these interrogatories should not have
been modified. The objection was interposed that Lahiff
had not shown any liability to employ counsel, and that it
was not within the province of the court to act both as
counsel and judge. The judge then ruled he was examin-
ing the witness for the due expedition of business. The
court let Lahiff attempt the sixth witness, but after unsuc-
cessful instructions by the judge, the latter again resumed
the direct examination. Like scenes occurred at the direct
examination of the seventh witness as to Lahiff's reputa-
tion. During Lahiff's efforts to examine some of these
witnesses the court suggested to him questions to ask which
he had omitted. As before stated, in all but two or three
of the matters hereinabove stated, exceptions were duly
preserved to the rulings of the court and to the course
pursued by the judge. This testimony to Lahiff's general
reputation was, no doubt, competent to aid in securing a
light punishment, although he did not claim to be innocent.
But its most important effect in this case was liable to be to

incline the jury to consider the evidence of Lahiff against
Looney and Kelly worthy of belief. While it was addressed
to the honesty of Lahiff, yet the establishment of that was
calculated to carry with it a belief in his truth.

The matters concerning Lahiff and Cox and the witnesses
to Lahiff's reputation occupied considerable time before the
jury, for their history covers 175 typewritten pages in the
record. During all that time the trial judge put himself in
the position before the jury of acting for Lahiff and Cox;
he frequently intervened for them, advised them, objected
for them, ruled upon his own objections, examined Lahiff's
witnesses, and ruled upon the objections to his own ques-
tions; and this was not done to protect Lahiff and Cox
from the State's attorney; but it assisted Lahiff and Cox to
convict Looney and Kelly; for the testimony so put in was
the most material evidence against Looney and Kelly, with-
out which, in our judgment, it is not likely they would have
been convicted. The jury could not fail to be impressed
that the court was on the side of Lahiff and Cox and
against Looney and Kelly. It was not possible the trial
judge could rule fairly and impartially upon a line of ques-
tions framed by himself. It is obvious counsel for Looney
and Kelly could not feel the same freedom to object to
such questions and to argue the objections that they would
to questions framed by Lahiff and Cox or counsel for them.
They were forced to let the court go on without interrup-
tion or objection, or be put before the jury in an attitude of
hostility to the court. Looney and Kelly were just as much
entitled to the protection of the court as Lahiff and Cox.
The circumstances did not specially call for the court to
assist Lahiff and Cox. We have already referred to the
proof of the motive which induced them to testify. Several
of the witnesses to Lahiff's reputation admitted, on cross-
examination, that they had heard he had served in the peni-
tentiary. Cox admitted he had fought seven or eight prize
fights, and followed that as an occupation for a time.

We concede to every trial judge a wide latitude in pro-
tecting those who are defenseless from improper proof and

from assaults by opposing counsel, and also in putting questions which will bring out the truth upon points not rendered sufficiently clear by the examination of counsel; but great care should be taken to exercise this power only when necessary, and then in such a way as not to indicate any bias of the court for or against either party, and so as not to create any apprehension in the mind of either party, or of counsel, that the court is taking sides before the jury. The subject is fully discussed, and the power of the court and the limitations thereon stated in Dunn v. The People, 172 Ill. 586, and page 595 of that opinion is fairly applicable to this case. The case against Looney and Kelly was planned with great art by some one. Though Lahiff and Cox had testified before the grand jury they were not put on the stand by the people at the trial. Looney and Kelly were allowed to complete their defense to the weak case the State had made against them. Then Lahiff and Cox took the stand after the State's attorney had assured the court and jury they were not actuated by any motives of self-serving, thus preparing the minds of the jury to believe them. They were unable to distinguish what was competent testimony, without legal assistance, and the court felt bound to help them, and they put in the evidence upon which the conviction of Looney and Kelly must have been based. The trial judge was thus drawn into a position before the jury apparently antagonistic to Looney and Kelly, and no doubt without realizing at the outset how far he would become involved against them as the trial proceeded. When the jury are in doubt the attitude of the court often controls them. The State's attorney obtained the right to cross examine Lahiff and Cox, and used it to bolster up their testimony, and not to scrutinize it or test its truth. This testimony, coming after Looney and Kelly had put in their defense and had testified, necessarily had a great effect upon the jury—a much greater effect than if Lahiff and Cox had been put upon the stand by the State at the trial as ordinary witnesses for the prosecution. Then the witnesses to Lahiff's reputation were called to strengthen the case—a class of testimony the people could not have

put in. We can not believe Lahiff and Cox were equal to planning this strategy. If it was planned by any one connected with the prosecution it was highly improper, for it is the duty of the State to treat the defendants in a criminal case fairly. If it was planned by some one not openly connected with the case on either side, its effect upon Looney and Kelly was equally unfair and disastrous. It does not meet our approval. Lahiff and Cox should have been restricted to proof bearing upon their own guilt or innocence.

The court refused to let the defendants prove Frick's inspection and approval of the work as it proceeded. Frick was inspector of the work as the representative of the city. Though he was indicted, yet the court could not assume before verdict that he was in fact either a conspirator or incompetent. We think this evidence should have gone to the jury. If it turned out that he was a conspirator or had corruptly abandoned the city's interests, or was incompetent, very likely the evidence of his inspection and approval would have very little or no weight with the jury. On the other hand, if it turned out that he was not a conspirator and not incompetent, this evidence would have had weight with the jury. The mayor also did various things for the city in connection with this contract which the court refused to permit to be proved, where we think the defendants were entitled to the proof, as he was the representative of the city.

. Certain questions put by the defendants to their witnesses touching the comparative merits of Milwaukee and Portland cement were leading and suggestive, and for that reason the court did not err in sustaining objections to them. But we think the court did unduly restrict defendants in other efforts they made to prove the qualities and value of Milwaukee cement, as compared with Portland cement, for the uses to which cement was here put. It is true the contract was to use Portland cement, and if the contractor used Milwaukee cement he committed a breach of the contract; but this is not a suit for breach of contract. One material question is whether the parties intend to defraud the city,

and upon that question the merits of Milwaukee cement were material. If it was just as good and as useful to the city as Portland cement that fact would have a strong bearing upon the question of intent. True, the people had introduced evidence making a strong case that Milwaukee cement was very inferior to Portland cement, but the defense had a right to try to overcome that proof.

Looney and Kelly, by several motions at different stages of the trial, sought to obtain possession of the minutes of the testimony given by Lahiff and Cox before the grand jury. The court denied their applications, and properly so. (Cannon v. The People, 141 Ill. 270.) They also placed upon the stand Blakemore, a stenographer, and proved by him that he took the evidence of Lahiff and Cox before the grand jury; that he had the stenographic notes in his hand, and that they were correct; and then asked him whether Lahiff made a certain statement before the grand jury. An objection was sustained to this testimony. The abstract does not show that this precise question was put to Lahiff when upon the stand. The objection was therefore properly sustained. They then asked Blakemore to reproduce before the jury all the testimony of Lahiff before the grand jury in relation to Kelly's giving or offering Brown money. An objection to this question was properly sustained. Where an effort is made to impeach a witness by proving that he has made statements before the grand jury different from his testimony at the trial, the procedure is the same as that to be followed when it is sought to contradict him by his statements made anywhere else. The witness sought to be impeached must first be asked if he did at the time and place named make a certain statement. Unless he admits it, any person who heard that statement may be called and asked if at that time and place said witness made that statement. Beyond that the impeaching party has no right to go. The abstract does not show that Looney and Kelly proceeded in that manner here. Therefore the ruling of the court was correct.

The people proved that Looney and Kelly furnished their

certified check for $500 to be deposited with Mulhern's bid. This tended to show they had a financial interest in the contract. Looney testified he did this at the request of his client, Schnell, who became Mulhern's surety. Looney and Kelly then sought to show they had done this for Schnell before, and that it was customary for those who bid for Rock Island City contracts to deposit some other check than their own. The court sustained objections to this testimony. This proof had a tendency to weaken or overcome the force of the fact that they furnished this check, and should have been admitted under the circumstances of this case.

The State proved by the witness, Kennedy, a conversation with Looney and Kelly on January 16th, in which Looney told him they were to share in the profits upon this contract. Looney and Kelly each testified they never so stated to Kennedy, and they also proved that at that date they were together in a hospital in Chicago, where a serious surgical operation had been performed upon Looney on January 11th, thus establishing a complete *alibi* as to the time and place fixed by Kennedy. The proof of this *alibi* was made with considerable detail, and the State made no attempt to refute it upon rebuttal. But after the evidence was closed, and all arguments for defendants were completed, and the State's attorney was partly through the closing argument, the State, over the objections and protests of Looney and Kelly, was allowed to ask Kennedy the date of that conversation, and he fixed an entirely different date—when Looney and Kelly were in Rock Island. No facts were proven to show why the State did not call Kennedy upon this subject in rebuttal before the proofs were closed. The trial had lasted nearly a month, and it is manifest Looney and Kelly could not then meet this change of front. There were facts from which the State could argue to the jury Kennedy must have been mistaken in the date he had fixed, but on the other hand his testimony may have been false. At that closing hour of the trial there was no showing which justified the introduction of this testimony.

The judgment is reversed and the cause remanded for a new trial.